E. C. MANNING, County Treasurer, Appellant, v. OTTUMWA AUTO COMPANY, Defendant, et al., Appellee (two cases).

No. 39901.

OCTOBER 14, 1930.

1184

*E. K. Bekman*, County Attorney, for appellant.

*Gilmore & Moon*, for W. I. Gladish, appellee, and Ottumwa Auto Company.

*Jaques, Tisdale & Jaques*, for Wapello Motor Company.

DE GRAFF, J.—The defendant-appellee Ottumwa Auto Company is an Iowa corporation, with its principal place of business at Ottumwa, Iowa. It was engaged in the automobile business  for several years prior to April 22, 1926, when it sold to the defendant Wapello Motor Company the major part of its merchandise and personal property. The defendant-appellee W. I. Gladish was the president and active manager of the Ottumwa Auto Company and the owner of substantially all of its capital stock. The plaintiff-appellant is the county treasurer of Wapello County, Iowa. Taxes on the property of the Ottumwa Auto Company were levied as of January 1, 1926, in the sum of $772.98, and it is this tax which is involved herein. The only question presented on this appeal is whether W. I. Gladish, president and general manager of the Ottumwa Auto Company, is personally liable to pay said taxes, on the claim and theory of the plaintiff county treasurer that the proceeds of the sale of the corporate property were diverted and appropriated by Gladish subsequent to the tax assessment in question. This presents a fact question, and both parties concede that no legal proposition is involved.

Section 8378, Code, 1927, is the basis of the action against Gladish. It reads:

"The diversion of the funds of the corporation to other objects than those mentioned in its articles and in the notice

published, if any person be injured thereby, and the payment of dividends which leaves insufficient funds to meet the liabilities thereof, shall be such fraud as will subject those guilty thereof to the penalties of the preceding section; and such dividends, or their equivalent, in the hands of stockholders, shall be subject to such liabilities. If the directors or other officers or agents of any corporation shall declare and pay any dividend when such corporation is known by them to be insolvent, or any dividend the payment of which would render it insolvent, or which would diminish the amount of its capital stock, all directors, officers, or agents knowingly consenting thereto shall be jointly and severally liable for all the debts of such corporation then existing, but dividends made in good faith before knowledge of the occurring of losses shall not come within the provisions of this section.''

Under the terms of the preceding section, 8377, it is provided that intentional fraud in failing to comply substantially with the articles of incorporation, or in deceiving the public or individuals in relation to their means or their liabilities, shall be a misdemeanor, and that any person who has sustained injury from such fraud may also recover damages therefor against those guilty of participating in such fraud. Does the evidence show that Gladish, as a corporate officer, did divert the funds of the corporation to other objects than those mentioned in its articles and in the notice published? There can be no question, under this record, that Gladish, as a corporate officer, did take possession of the proceeds of the sale of the Ottumwa Auto Company. He did go to Fort Worth, Texas, and personally engage in a similar business.

The sale of the personal property of the Ottumwa Auto Company to the Wapello Motor Company on or about April 22, 1926, amounted to $31,421.18, and it was paid as follows: April 21, 1926, $5,000; April 24, 1926, $10,000; April 29, 1926, $5,000; April 29, 1926, $11,421.18. The bank account of the Ottumwa Auto Company was kept in the First National Bank of Ottumwa, and it is shown by the books of said bank that the deposits of Gladish in said bank included the amounts paid by the Wapello Motor Company for the property of the Ottumwa Auto Company at or about the time the purchase price payments were made by the purchaser, Wapello Motor Company. It was

1186

agreed, as shown by the record, that all of said checks were made to and indorsed in the name of the Ottumwa Auto Company, and that the indorsement was made by Gladish. It is also shown that Gladish, on April 26, 1926, withdrew by check from said account $18,232.61, and on May 15, 1926, withdrew by check the sum of $15,840.36. The cashier of the First National Bank of Ottumwa testified that these were the largest withdrawals, but that there were withdrawals "every day in between the dates April 23, 1926, and May 15, 1926, in miscellaneous amounts." The cashier Ackley testified that he knew Gladish took money when he went to Fort Worth, Texas, to go into business at that place, and stated that Gladish took somewhere in the neighborhood of fifteen to twenty thousand, when he went to Fort Worth. The cashier further testified that he knew that Gladish used personal securities in his investment at Fort Worth. The record also shows that the Ottumwa Auto Company left notes for collection at the bank, some of which had been collected. Furthermore, a part of those notes were remitted to Mr. Gladish, and a part of them were turned over to a creditor, and all of the proceeds that the bank collected were assigned to a creditor of the Ottumwa Auto Company. The contract of sale of the Ottumwa Auto Company with the Wapello Motor Company included substantially all of its property in its place of business in the city of Ottumwa, Iowa, and it is shown that Gladish received the full purchase price. Prior to the date of the contract of sale and payment for the merchandise sold, the 1926 taxes were due and payable. There was nothing of value left in the possession of the Ottumwa Auto Company two or three months after the sale. Cashier Ackley testified: "I do not know of any property the Ottumwa Auto Company left here in Ottumwa." True, the corporation known as the Ottumwa Auto Company was not formally or legally dissolved, but whether it was or not, Gladish, as officer and owner of substantially all the stock, may not say to the plaintiff county treasurer: "Go to. I have sold the assets of my corporation, received the proceeds, and have repudiated the debt due the sovereign state." It would be a fraud upon the state and upon the plaintiff, as representative of the county of Wapello. The statute of this state prohibits the diversion of corporate funds to other things than those mentioned in its articles, and it is

a well settled rule of the common law that stockholders of a corporation cannot divide its property or assets among themselves without first paying the corporate debts. See *Luedecke v. Des Moines Cab. Co.*, 140 Iowa 223. In the case of *Swartley v. Oak Leaf Creamery Co.*, 135 Iowa 573, the defendant company became dormant, and the directors of the company made a distribution of corporate funds among the stockholders, thereby rendering the company insolvent, and without paying existing indebtedness. It was held, in substance, that the directors, knowing that it would render the company insolvent, or materially diminish its capital stock, were personally liable for then existing indebtedness, and that a creditor had the right to recover against said directors either jointly or severally, and without first exhausting the property of the corporation. See, also, *Wisconsin & Ark. Lbr. Co. v. Cable*, 159 Iowa 81.

We cannot escape the conclusion that the defendant Gladish in the instant case appropriated to his own use substantially all the assets of the Ottumwa Auto Company. No corporate property of any value was left in the state of Iowa to pay the debt owed to this plaintiff.

This is an appeal in equity; and in this court, the facts, as well as the law of the case, are reviewed and readjudicated. *Pierce v. Wilson*, 2 Iowa (Clarke) 20, 26. It is said in *Austin & Spicer v. Carpenter*, 2 G. Greene (Iowa) 131, l. c. 135:

"On appeal, a court of equity, freed from those rigid rules which limit and confine a court of errors, having acquired jurisdiction, will examine into the merits of the case for the purpose  of administering justice, guided only by the universal principles of equity jurisprudence. Not confined to errors apparent, the court will correct errors of conscience, which sometimes are of such a nature that they cannot be spread upon the record. All appeals in chancery must be tried *de novo*, the same as if this court had original jurisdiction, regardless of the decision of the court below, except so far as necessary to a correct understanding of the record and the matters at issue."

It may be pointed out that the defendant Gladish did not personally appear upon the trial of this cause, nor was his depo-

sition taken; but his attorney appeared for and on his behalf, having entered an appearance for Gladish, and participated in the trial. The decree and judgment entered as to the defendant Gladish is—*Reversed.*

MORLING, C. J., and STEVENS, ALBERT, and WAGNER, JJ., concur.